# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE VAXART, INC.
STOCKHOLDER LITIGATION

)  CONSOLIDATED
)  C.A. No. 2020-0767-PAF

## MEMORANDUM OPINION

Date Submitted: August 24, 2021
Date Decided: November 30, 2021
Corrected: December 1, 2021

Stephen E. Jenkins, F. Troupe Mickler, IV, ASHBY & GEDDES, P.A., Wilmington, Delaware; Gregory V. Varallo, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Jeroen van Kwawegen, Daniel E. Meyer, Margaret Sanborn-Lowing, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Gustavo F. Bruckner, Samuel J. Adams, Daryoush Behbood, POMERANTZ LLP, New York, New York; Sascha N. Rand, Rollo C. Baker, IV, Silpa Maruri, Jesse Bernstein, Charles H. Sangree, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; Stanley D. Bernstein, Matthew Guarnero, BERNSTEIN LIEBHARD LLP, New York, New York; William J. Fields, Christopher J. Kupka, Samir Shukurov, FIELDS KUPKA & SHUKUROV LLP, New York, New York; *Attorneys for Plaintiffs*.

Brock E. Czeschin, Andrew L. Milam, RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware; Riccardo DeBari, Renee Zaytsev, Mendy Piekarski, THOMPSON HINE, New York, New York; *Attorneys for Andrei, Wouter W. Latour, Todd Davis, Michael J. Finney, Robert A. Yedid, Anne M. VanLent, and Nominal Defendant Vaxart, Inc*.

Matthew F. Davis, Abraham C. Schneider, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Douglas A. Rappaport, Kaitlin D. Shapiro, Elizabeth C. Rosen, Madeleine R. Freeman, AKIN GUMP STRAUSS HAUER & FELD LLP, New York, New York; *Attorneys for Defendants Steven Boyd, Keith Maher, Armistice Capital, LLC.*

**FIORAVANTI, Vice Chancellor**

Vaxart, Inc. ("Vaxart" or the "Company") is a small biotechnology company that embarked on developing a vaccine for COVID-19 in the early stages of the pandemic. In early June 2020, the Company's board of directors agreed to amend two warrant agreements between the Company and its one-time majority stockholder. The warrant amendments permitted the stockholder to beneficially own a greater number of Vaxart shares upon exercise of the warrants. In effect, it enabled the stockholder to exercise and dispose of the warrant shares faster than under the terms of the original warrants. A few days later, Vaxart stockholders voted on an amendment to the Company's incentive compensation plan to increase the number of shares eligible for grant. A few weeks after those two events, the Company announced that it had been selected to participate in a non-human primate study sponsored by Operation Warp Speed, the federal government's program to accelerate the development and distribution of a COVID-19 vaccine. The Company's stock price jumped upon the announcement.

The plaintiffs in this action are Vaxart stockholders who have asserted a variety of claims arising from the three events described above. Plaintiffs allege that the Company's board and former majority stockholder had knowledge of Vaxart's selection to participate in the non-human primate study before the board approved the warrant agreement amendments and before the stockholder vote on the amendment to the equity incentive plan. Plaintiffs allege the board withheld the

2

disclosure of that information until after those two events so as to benefit themselves in the form of spring-loaded option grants, and to benefit the former majority stockholder, which exercised the warrants and sold most all of the underlying shares within two days of the public announcement of Vaxart's participation in the non-human primate study. Plaintiffs have asserted claims for breach of fiduciary duty, unjust enrichment, and aiding and abetting. All defendants have moved to dismiss the complaint in its entirety. In this opinion, I grant the motion as to certain claims, and I request additional briefing on two discrete issues.

## I.     BACKGROUND

Unless otherwise specified, the facts recited in this Memorandum Opinion are drawn from the Verified Complaint (the "Complaint" or "Compl.") and documents integral thereto.[1]

---

[1] Dkt. 1. Exhibits attached to the Complaint will be cited as "Ex." Exhibits entered into the record by the Armistice Defendants (defined below) will be cited as "Armistice Defs.' Ex." Exhibits entered into the record by the Vaxart Defendants (defined below) will be cited as "Vaxart Defs.' Ex." Plaintiffs have objected that Defendants have introduced into the record "extraneous documents" produced to Plaintiffs in response to books and records demands under 8 *Del. C.* § 220. Pls.' Ans. Br. at 34. Plaintiffs' characterization of Vaxart's participation in Operation Warp Speed have prompted the Defendants to request that I "review the actual documents to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to have drawn is a reasonable one." *In re CBS Corp. S'holder Class Action & Deriv. Litig.,* 2021 WL 268779, at *18 (Del. Ch. Jan. 27, 2021) (citations omitted). The Plaintiffs' respective Confidentiality Agreements with the Company governing the production of Section 220 documents each provide that all "documents" produced pursuant to the agreements "will be deemed incorporated by reference in any complaint relating to the subject matter referenced in the Demand[s]." Armistice Defs.' Exs. 1 ¶ 11, 2 ¶ 13. The Confidentiality Agreement between the Company

## A. The Parties

Plaintiffs Cynthia Jaquith and Paul Bergeron have been Vaxart stockholders since April 2020.[2] Plaintiff Kenny Galjour alleges to have been a Vaxart stockholder "at all relevant times."[3] They are collectively referred to as "Plaintiffs" herein.

Vaxart is a Delaware corporation based in San Francisco, California.[4] The Company is a "clinical-stage biotechnology company focused on vaccine development."[5] "Vaxart has developed a proprietary delivery platform that allows the vaccines it develops to be administered orally."[6] Vaxart is the result of a 2018 reverse merger (the "Merger") between Vaxart, Inc. ("Private Vaxart"), then a

---

and Jaquith and Bergeron makes incorporation conditional upon written confirmation from the Company that it "believes in good faith that it has completed production" of all in-scope documents within five business days of making a "good-faith determination" as to such. Armistice Defs.'s Ex. 2 ¶ 14. Defendants have entered into the record an October 1, 2020 letter representing that "on September 1, 2020, the Company provided the written certification required by Paragraph 14 of the Confidentiality Agreement, stating that it believes in good faith that it has completed its production of the documents that the Company stated it will produce, all of which are within the scope of the Demands." Vaxart Defs.' Ex. 28. Plaintiffs have not disputed this representation. Nevertheless, the incorporation by reference of documents produced under Section 220 "does not change the pleading standard that governs a motion to dismiss." *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 798 (Del. Ch. 2016), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019). "If there are factual conflicts in the documents or the circumstances support competing interpretations, and if the plaintiff makes a well-pleaded factual allegation, then the allegation will be credited. *Id.*

[2] Compl. ¶ 20.

[3] Galjour Compl. ¶ 17.

[4] Compl. ¶ 21.

[5] *Id.* ¶ 32.

[6] *Id.*

privately held company, and Aviragen Therapeutics, Inc. ("Aviragen"). [7] As a result of the Merger, Private Vaxart became a subsidiary of Aviragen and Aviragen changed its name to Vaxart.[8] Certain Aviragen directors continued on after the Merger as directors of the post-Merger parent company ("Vaxart").[9] Shares of Vaxart's common stock trade on the Nasdaq stock market under the symbol "VXRT."[10]

Defendant Armistice Capital LLC, a Delaware limited liability company ("Armistice"), is a hedge fund focused on the health and consumer sectors.[11] Armistice was a Vaxart stockholder from September 26, 2019[12] until at least June 29, 2020, the date of its last publicly reported trade.[13] Plaintiffs allege that "Armistice was Vaxart's controlling shareholder."[14]

---

[7] Vaxart Defs.' Ex. 3 at 95.

[8] *Id.*

[9] *See* Vaxart, Inc. Schedule 14A (Apr. 24, 2020) ("Proxy") at 9–10, 12.

[10] Vaxart Defs.' Ex. 3.

[11] Compl. ¶¶ 1, 22.

[12] Vaxart Inc., Schedule 13D (Oct. 1, 2019). I take judicial notice of this and other SEC filings cited in this Opinion to the extent they are "matters that are not subject to reasonable dispute." *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006). *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 n.28 (Del. 2004) (noting that courts may take judicial notice of contents of public documents such as SEC filings required by law to be filed).

[13] Vaxart Inc., Schedule 13D (June 30, 2020).

[14] Compl. ¶ 22.

Defendants Steven Boyd and Keith Maher are employees of Armistice.[15] Boyd is the fund's Chief Investment Officer and Maher is a Managing Director.[16] Boyd and Maher joined Vaxart's board of directors (the "Board") in October 2019.[17] Boyd and Maher are together the "Armistice Directors" and, together with Armistice, the "Armistice Defendants."

Defendant Wouter W. Latour is the Chairman of the Board.[18] Latour served as a director and Chief Executive Officer ("CEO") of Private Vaxart since September 2011 through the Merger, and has continued to serve as a director since then.[19] He also continued to serve as the CEO of Vaxart since the Merger until his resignation on June 14, 2020.[20]

Defendant Andrei Floroiu is the current CEO of Vaxart.[21] Floroiu joined the Board on April 13, 2020.[22] The Board appointed him as CEO on June 15, 2020 effective June 14, 2020.[23]

---

[15] *Id.* ¶ 36.

[16] *Id.*

[17] *Id.* ¶¶ 23–24.

[18] *Id.* ¶ 25.

[19] Proxy at 9.

[20] Compl. ¶ 25.

[21] *Id.*

[22] *Id.* ¶¶ 38, 103.

[23] Vaxart Inc., Current Report (Form 8-K) (June 15, 2020). The Complaint alleges that Floroiu "served as . . . CEO of the Company since June 15, 2020." Compl. ¶ 26.

6

Michael J. Finney was on the board of Private Vaxart since July 2007 and has stayed on after the Merger as a Vaxart director.[24] He also served as the CEO of Private Vaxart from 2009 until 2011.[25]

Defendants Robert A. Yedid and Todd Davis became Vaxart directors in October 2019 upon being appointed by the Board.[26] Davis served on the Board's Compensation Committee (the "Compensation Committee") "at all times relevant hereto."[27]

Anne M. VanLent was a director of Private Vaxart from 2013[28] until the Merger and stayed on as a Vaxart director until June 8, 2020.[29] VanLent was not nominated for reelection at the 2020 annual meeting of Vaxart stockholders.[30]

Latour, Boyd, Davis, Finney, Maher, Yedid, and VanLent were members of the Board when: (i) on March 24, 2020, the Board approved a grant of time-based stock options covering a total of 2,610,000 shares that would be "exercisable" upon approval by Vaxart stockholders of an amendment to Vaxart's equity incentive plan (the "2019 Amendment") and (ii) on April 13, 2020, the Board approved a grant of

---

[24] Proxy at 10.

[25] *Id.*

[26] Compl. ¶¶ 28–29; Vaxart Inc., Current Report (Form 8-K) (Oct. 28, 2019).

[27] Compl. ¶ 28.

[28] Vaxart Inc., Form 10-K (Feb. 6, 2019) at 120.

[29] Compl. ¶ 30.

[30] *See* Proxy at 9.

time-based stock options to Floroiu covering a total of 54,720 shares.[31] Along with Floroiu, these individuals constituted the Board when: (i) on April 24, 2020, Vaxart issued the proxy statement (the "Proxy") for stockholder approval of the 2019 Amendment;[32] (ii) on June 5, 2021, the Board approved by written consent the Warrant Amendments (as defined below);[33] and (iii) on June 8, 2020, the annual meeting of stockholders took place.[34] Floroiu, Latour, Boyd, Davis, Finney, Maher, and Yedid constituted the Board when (i) on June 8, 2020, the Board granted stock option awards to Davis, Finney, Yedid and approved changes to the terms of VanLent's stock options[35] and (ii) on June 13, 2020, the Board approved the terms of a separation agreement with Latour permitting his stock options to continue to vest after his resignation as CEO and granted Floroiu additional stock options upon his appointment as CEO.[36]

---

[31] Proxy at 32–33. Defendants assert that Floroiu was not a member of the Board when it approved his stock option award and that he only "joined the Board later that same day." Defs.' Opening Br. at 11. Plaintiffs do not dispute this assertion or allege otherwise; the Complaint asserts only that "on April 13, 2020, Floroiu joined the Board" but does not specify when Floroiu's appointment became effective. Compl. ¶ 38.

[32] *See* Compl. ¶ 93; Armistice Defs.' Ex. 26; Proxy at 33.

[33] Compl. ¶ 8; Vaxart Defs.' Ex. 14.

[34] Compl. ¶ 15.

[35] *See id.* ¶ 53; Vaxart Defs.' Ex. 26.

[36] Vaxart Defs.' Ex. 27.

8

Latour, Boyd, Davis, Finney, Maher, Yedid, VanLent are together the "Director Defendants."

**B.    Armistice Executes a Warrant Agreement and Later Becomes Vaxart's Controlling Stockholder.**

On April 11, 2019, Armistice and Vaxart entered into a Common Stock Purchase Warrant (the "April 2019 Warrant") giving Armistice the right to purchase from Vaxart up to 4,090,909 shares of Vaxart's common stock at an exercise price of $1.10 at any time until April 11, 2024.[37]

On September 26, 2019, two weeks after engaging in two short-sale trades, Armistice began buying Vaxart shares on the open market.[38]  By September 30, 2019, it had accumulated an equity stake sufficiently large to give it, as of that date, "approximately 52% of the voting power of [Vaxart's] outstanding shares of common stock."[39]

On September 30, 2019, Armistice and Vaxart entered into a second Common Stock Purchase Warrant (the "September 2019 Warrant" and together with the April 2019 Warrant, the "Warrants") giving Armistice the right to purchase another 16,666,667 shares at an exercise price of $0.30 per share until September 30, 2024.[40]

---

[37] Armistice Defs.' Ex. 9.

[38] Vaxart, Inc., Schedule 13D (Oct. 1, 2019).

[39] Vaxart, Inc., Form 10-Q (Nov. 12, 2019) at 36.

[40] Armistice Defs.' Ex. 10.

Each Warrant contained a blocker provision ("Blocker").[41] Section 2(e) of the April 2019 Warrant provides:

> The Holder shall not have the right to exercise any portion of this Warrant, pursuant to Section 2 or otherwise, to the extent that after giving effect to such issuance after exercise as set forth on the applicable Notice of Exercise, the Holder (together with the Holder's Affiliates, and any other Persons acting as a group together with the Holder or any of the Holder's Affiliates (such Persons, "Attribution Parties")), would beneficially own in excess of the Beneficial Ownership Limitation (as defined below).[42]

Section 2(e) also makes clear that:

> For purposes of the foregoing sentence, the number of shares of Common Stock beneficially owned by the Holder and its Affiliates and Attribution Parties shall include the number of shares of Common Stock issuable upon exercise of this Warrant with respect to which such determination is being made, but shall exclude the number of shares of Common Stock which would be issuable upon (i) exercise of the remaining, nonexercised portion of this Warrant beneficially owned by the Holder or any of its Affiliates or Attribution Parties . . . .[43]

*Id.* The Beneficial Ownership Limitation in the April 2019 Warrant "shall be 4.99% of the number of shares of the Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock issuable upon exercise of this Warrant."[44] Section 2(e) also gives the holder of the Warrant the right to increase the Holder's Exercise Limitation to 9.99% upon giving Vaxart 60-days' notice:

---

[41] Compl. ¶ 60; Armistice Defs.' Exs. 9–10.

[42] Armistice Defs.' Ex. 9. § 2(e).

[43] *Id.*

[44] *Id.*

> The Holder, upon notice to the Company, may increase or decrease the Beneficial Ownership Limitation provisions of this Section 2(e), provided that the Beneficial Ownership Limitation in no event exceeds 9.99% of the number of shares of the Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of this Warrant held by the Holder and the provisions of this Section 2(e) shall continue to apply. Any increase in the Beneficial Ownership Limitation will not be effective until the 61st day after such notice is delivered to the Company.[45]

Blockers (also called conversion caps) like the one here permit a stockholder to avoid triggering certain federal securities law requirements tied to beneficial ownership.[46]

Most notable here, conversion caps permit a stockholder that would otherwise be forced to disgorge profits from short-term sales of the issuer's securities under Section 16 of the Securities Exchange Act of 1934 (the "Exchange Act") to engage in short-term trading of the issuer's stock so long as its stock holdings do not exceed 10%, even as the stockholder retains the option to buy additional shares.[47]

---

[45] *Id.*

[46] *See, e.g.*, 17 C.F.R. § 240.13d-1(a) (requiring certain SEC filings for persons who are, directly or indirectly, the beneficial owners of any class of equity securities of the registrant).

[47] *See ION Geophysical Corp. v. Fletcher Int'l, Ltd.*, 2010 WL 4378400, at *13 (Del. Ch. Nov. 5, 2010) ("Conversion caps often are structured to prohibit an investor from converting preferred stock if such conversion would result in the investor owning more than a specified percentage of the issuer's common stock so as not to trigger § 16(b)."). Under the disgorgement rule of Section 16(b) of the Exchange Act, "statutory insiders—those with a beneficial ownership interest of more than 10% in an equity security"—must "disgorge all profits realized from any purchase and sale (or sale and purchase) of the same security made within a six-month period." *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 43 (2d Cir. 2012). Under the SEC's implementing regulations, "Section 16 adopts the definition of 'beneficial owner' found in Section 13(d) of the Exchange Act and the rules promulgated thereunder solely for purpose of determining who is a 'beneficial

The September 2019 Warrant Blocker was identical to the one in the April 2019 Warrant with one exception: the September 2019 Warrant had a higher Beneficial Ownership Limitation threshold of 9.99%.[48]

On October 25, 2019, the Board appointed Boyd and Maher (the "Armistice Directors"), along with Yedid and Davis, who replaced two directors who resigned that day.[49]

## C.    Vaxart's Vaccine Development Efforts

As of December 31, 2019, Vaxart only had 14 full-time employees,[50] had experienced two consecutive years of net losses,[51] and had never brought a vaccine to market.[52]  On January 31, 2020, in the early stages of the COVID-19 pandemic,

---

owner' of more than ten percent of the issuer.'  *Roth v. Solus Alternative Asset Mgmt. LP*, 124 F. Supp. 3d 315, 321 (S.D.N.Y. 2015); 17 C.F.R. § 240.16a–1(a)(1).  Beneficial ownership also attaches to the right to acquire securities "within sixty days," 17 C.F.R. § 240.13d–3(d)(1)(i), "deeming owners of such a right as owners of the underlying stock itself." *Roth*, 124 F. Supp. 3d at 321.

[48]  Armistice Defs.' Ex. 10. § 2(e).  The September 2019 Warrant also gave the Warrant holder the right to "increase" the threshold with 60 days' notice, but that provision was dead letter since the Warrant holder may only increase the threshold up to 9.99%.

[49] Compl. ¶ 36; Vaxart, Inc., Current Report (Form 8-K) (Oct. 28, 2019).

[50] Vaxart Inc., Form 10-K (Mar. 19, 2020) at 38.

[51] *Id.* at 120.

[52] Compl. ¶ 33; *see* Vaxart Inc., Form 10-K (Mar. 19, 2020) at 38 ("[W]e . . . have not yet successfully completed a large-scale, pivotal clinical trial, obtained marketing approval, manufactured our tablet vaccine candidates at commercial scale, or conducted sales and marketing activities that will be necessary to successfully commercialize our product candidates.").

12

Vaxart "announced it was developing a vaccine for COVID-19."[53] Vaxart's stock price closed at $1.25 per share that day.[54] In March 2020, Vaxart disclosed that "our business currently depends heavily on the successful development, regulatory approval and commercialization of our coronavirus and norovirus tablet vaccine."[55] That month and in ensuing months, Vaxart disclosed its incremental COVID-19 vaccine development progress in its Form 8-K filings with the Securities & Exchange Commission ("SEC"):

- On March 18, 2020, Vaxart announced a contract with Emergent BioSolutions, Inc. to use Emergent's "molecule-to-market contract development and manufacturing (CDMO) services" to help develop and manufacture Vaxart's COVID-19 oral vaccine candidate.[56] Vaxart's stock price closed at $2.34 per share that day.[57]

---

[53] Compl. ¶ 39.

[54] "VXRT US Equity: Historical Values," accessed Nov. 8, 2021, Bloomberg Law. Here and elsewhere, "I take judicial notice of these reported stock prices because they are not subject to reasonable dispute." *Lee v. Pincus*, 2014 WL 6066108, at *4 n.11 (Del. Ch. Nov. 14, 2014) (citing D.R.E. 201(b)(2)).

[55] Vaxart Inc., Form 10-K (Mar. 19, 2020) at 40.

[56] Vaxart, Inc., Current Report (Form 8-K) (Mar. 19, 2020), Ex. 99.2.

[57] "VXRT US Equity: Historical Values," accessed Nov. 8, 2021, Bloomberg Law.

- On April 21, 2020, Vaxart "announced that its lead vaccine candidates generated anti-SARS CoV-2 antibodies in all tested animals after the first dose."[58] Vaxart's stock price closed at $3.16 per share that day.[59]

- On May 12, 2020, the Company reported that "the Company's lead vaccine candidates generated robust anti-SARS CoV-2 antibodies in all tested animals after both the first and second dose, with a clear boosting effect after the second dose."[60] Vaxart's stock price closed at $2.93 per share that day.[61]

- On June 18, 2020, Vaxart released a corporate presentation describing its "Covid-19 program" as "advancing rapidly."[62] Vaxart's stock price closed at $2.57 per share that day.[63]

Vaxart also sought government funding for its vaccine development efforts.[64] Obtaining such funding, Plaintiffs allege, would be a "watershed moment"[65] for "one

---

[58] Vaxart, Inc., Current Report (Form 8-K) (April 29, 2020), Ex. 99.1; Compl. ¶ 41.

[59] "VXRT US Equity: Historical Values," accessed Nov. 8, 2021, Bloomberg Law.

[60] Vaxart, Inc., Current Report (Form 8-K) (May 12, 2020), Ex. 99.1

[61] "VXRT US Equity: Historical Values," accessed Nov. 8, 2021, Bloomberg Law.

[62] Vaxart, Inc., Current Report (Form 8-K) (June 18, 2020), Ex. 99.1 at 14.

[63] "VXRT US Equity: Historical Values," accessed Nov. 8, 2021, Bloomberg Law.

[64] Compl. ¶ 41.

[65] *Id.* ¶ 52.

of many clinical stage biopharmaceutical companies enmeshed in the slow struggle to commercialize a drug."[66]

In March 2020, Vaxart completed an offering to sell 4,000,000 shares of its common stock and warrants to purchase up to 2,000,000 shares of its common stock to certain undisclosed "institutional and accredited investors."[67] The offering had the effect of diluting Armistice's equity stake; as of March 17, 2020, Armistice no longer owned more than 50% of Vaxart's common stock but still "beneficially owned more than 35% of the voting power of [Vaxart's] outstanding shares."[68]

---

[66] *Id.* ¶ 49.

[67] Vaxart Inc., Current Report (Form 8-K) (Mar. 2, 2020). Plaintiffs allege that Armistice provided equity financing through a private investment in public equity or "PIPE" transaction in January 2020. Compl. ¶¶ 34–35. Armistice disputes that allegation, noting that Boyd's director questionnaire inadvertently represented: "Pursuant to a PIPE Agreement with the Company on January 22, 2020, the Company appointed Steven Boyd and Keith Maher to its board of directors." Armistice Defs.' Ex. 8 at VAXART000334. Instead, according to the Armistice Defendants, Boyd was referring to a January 2020 PIPE transaction between Armistice and another entity, "Tetraphase Pharma." Armistice Opening Br. at 7 n.2.

Plaintiffs did not dispute this in their answering brief. I accept the Armistice Defendants' explanation, particularly since (1) Maher's director questionnaire did not make the same reference to a PIPE transaction (Armistice Defs.' Ex. 7 at VAXART000083); (2) Boyd and Maher were appointed as directors in October 2019, not January 2020; and (3) Tetraphase Pharmaceuticals, Inc. ("Tetraphase"), a Delaware corporation, entered into a PIPE Agreement on January 22, 2020 with Armistice pursuant to which the fund acquired 1,270,000 shares of Tetraphase common stock and warrants to purchase an additional 2,063,334 shares. Tetraphase Pharmaceuticals, Inc., Current Report (Form 8-K) (Jan. 23, 2020).

[68] Vaxart Inc., Form 10-K (Mar. 19, 2020) at 43.

15

Shortly thereafter, Armistice began selling off its Vaxart stock in April 2020,[69] to "lock in gains" from the appreciation of Vaxart's share price in the first three months of 2020.[70] Armistice continued its selling "nearly without pause" through June 3, 2020.[71] By that time, Armistice's ownership fell to approximately 7 million shares, or just under 10 percent of all outstanding common stock.[72] Armistice halted its selling spree on June 3, 2020.[73] As discussed below, Plaintiffs allege that "Armistice knew as of June 3, 2020, and likely on May 28, 2020," that the Company had been chosen to participate in Operation Warp Speed, the federal government's effort to speed development and distribution of a COVID-19 vaccine.[74]

### D. The Vaxart Board Approves the Warrant Amendments.

Amidist Armistice's sell-off of Vaxart shares, Boyd called Latour on May 14, 2020 to discuss amending the Warrant Agreements to remove or adjust the Beneficial Ownership Limitations in the Blockers.[75] That same evening, Latour contacted Faith Charles, Vaxart's outside counsel at Thompson Hine, and requested

---

[69] Compl. ¶ 43.

[70] *Id.* ¶ 42.

[71] *See id.* ¶¶ 43–44.

[72] Vaxart, Inc., Statement of Changes in Beneficial Ownership (Form 4) (June 3, 2020) (Armistice Capital, LLC filing); *see* Vaxart, Inc., Schedule 13D (June 9, 2020).

[73] Compl. ¶ 45.

[74] Compl. ¶ 122 (emphasis omitted).

[75] *Id.* ¶¶ 59, 63; Armistice Defs.' Ex. 11.

a call the next day, noting it was "not a huge rush."[76]  Two weeks later, on May 28, 2020, Latour and Boyd discussed the terms of the amendments to the Warrant Agreements ("Warrant Amendments"); after the call, Latour relayed to Charles that Boyd was comfortable "with the 19.99%" and requested another call.[77]

On May 19, 2020, four days after Boyd had first raised amending the Warrant Agreements, Yedid reached out to Latour to sell him on the idea.[78]  Yedid indicated that doing so would help position Vaxart for inclusion in the Russell 3000 index.[79]  Yedid also said that removing the 9.99% Blocker "will get more shares outstanding and maximize the number of Vaxart shares that would have to be bought . . . on the open market by the index funds that mimic the Russell 2000 or 3000."[80]  Yedid emailed Latour again on May 28, 2020, noting he was aware of Latour's discussions with Armistice, adding that "he would like to get a better understanding of the status of the Russell rebalancing process and whether VXRT can benefit" from moving forward with the Warrant Amendments.[81]

---

[76] Armistice Defs.' Ex. 11.

[77] Compl. ¶¶ 72–73.

[78] *Id.* ¶ 68; Vaxart Defs.' Ex. 19.  The Complaint conflates the May 19 and May 28, 2020 email exchanges.

[79] Vaxart Defs.' Ex. 19.

[80] *Id.*

[81] Compl. ¶ 67; Vaxart Defs.' Ex. 20.

On May 28, 2020, Latour sent an email to the Board, excluding the two Armistice Directors, to inform them of Latour's negotiations with Armistice about the Warrant Amendments.[82] Latour proposed a call, noting that "[t]he matter is complex, with a range of pros and cons."[83] Floroiu responded, copying the group, and asked Latour to "send us what you think the pros and cons are before the call, so we could give this some thought."[84] Latour did not respond by email, if at all.[85] The call took place on June 1, 2020.[86] No record of what was discussed at the meeting exists.[87] Nothing indicates any financial advisors joined the meeting.

### E. The 2019 Equity Incentive Plan

Like many early-stage biotech companies with little to no cash flow, Vaxart used equity awards to incentivize and compensate employees, directors, and contractors. On April 23, 2019, Vaxart's stockholders approved an equity incentive plan (the "2019 Plan" or "Plan"). The Plan authorized the Board to grant individual equity-based compensation "Awards"—among others, stock options, restricted stock awards, and stock appreciation rights ("SARs")—to "Employees, Directors

---

[82] Compl. ¶ 73; Armistice Defs.' Ex. 16.

[83] Compl. ¶ 73; Armistice Defs.' Ex. 16.

[84] Compl. ¶ 73; Vaxart Defs.' Ex. 22.

[85] Compl. ¶ 74.

[86] *Id.*

[87] *Id.*

and Consultants."[88]  The purpose of the Plan is to "provide incentives for such persons to exert maximum efforts for the success of the Company and any Affiliate, and provide a means by which the eligible recipients may benefit from increases in value of the Common Stock."[89]  The Plan authorized the Board to:

- Determine "who" will receive awards under the plan, the "type" of award granted, and "when and how" they will be granted, the "number of shares" in each award, and the "provisions of each Award."[90]

- "To accelerate, in whole or in part, the time at which an Award may be exercised or vest."[91]

- "[T]o amend the terms of any one or more Awards, including, but not limited to, amendments to provide terms more favorable to the Participant than previously provided in the Award Agreement, subject to any specified limits in the Plan that are not subject to Board discretion" and, among other restrictions, provided that the "rights under any Award will not be impaired by any such amendment."[92]

---

[88] Current Report (Form 8-K) (Apr. 23, 2019), Ex. 10.1 (the "2019 Plan").
[89] *Id.*
[90] 2019 Plan, § 2(b)(i).
[91] *Id.* § 2(b)(iv).
[92] *Id.* § 2(b)(viii).

- "[C]onstrue and interpret the Plan and Awards granted under it."[93] Additionally, "[a]ll determinations, interpretations and constructions made by the Board in good faith will not be subject to review by any person and will be final, binding and conclusive on all persons."[94]

The 2019 Plan contained other restrictions on the Board's authority. With certain exceptions, not pertinent here, "the exercise or strike price of each Option or SAR will be not less than 100% of the Fair Market Value of the Common Stock subject to the Option or SAR on the date the Award is granted."[95] Where, as here, Common Stock refers to shares of common stock "listed on any established stock exchange or traded on any established market," "Fair Market Value" is:

> unless otherwise determined by the Board, the closing sales price for such stock as quoted on such exchange or market (or the exchange or market with the greatest volume of trading in the Common Stock) on the date of determination, as reported in a source the Board deems reliable.[96]

> The Plan limited the number of shares of stock issuable under the 2019 Plan (the "Share Reserve") at 1.6 million shares of Vaxart common stock.[97]

---

[93] *Id.* § 2(b)(ii).

[94] *Id.* § 2(e).

[95] *Id.* § 5(b).

[96] *Id.* § 13(x)(i).

[97] *Id.* § 3(a)(i).

The Plan empowered the Board "[t]o amend the Plan in any respect the Board deems necessary or advisable, including, without limitation, by adopting amendments relating to Incentive Stock Options," but that authority was "subject to the limitations, if any, of applicable law."[98] The Plan also requires that, "[i]f required by applicable law or listing requirements,"

> the Company will seek stockholder approval of any amendment of the Plan that (A) materially increases the number of shares of Common Stock available for issuance under the Plan, (B) materially expands the class of individuals eligible to receive Awards under the Plan, (C) materially increases the benefits accruing to Participants under the Plan, (D) materially reduces the price at which shares of Common Stock may be issued or purchased under the Plan, (E) materially extends the term of the Plan, or (F) materially expands the types of Awards available for issuance under the Plan.[99]

### F. Vaxart Board Approves Stock Option Grants and Seeks to Amend the 2019 Plan.

On February 21, 2020, the Board approved an amendment to the Plan (the "2019 Amendment") that would increase the Share Reserve from 1.6 million to 8 million shares.[100] On March 24, 2020, the Board approved a grant of time-based

---

[98] *Id.* § 2(b)(vi).

[99] *Id.*

[100] Compl. ¶ 92. The Complaint calls the "increase [of] the shares reserved for issuance under the Company's equity incentive plan" the "2020 Plan." *Id.* ¶ 14. The Complaint alleges that "[t]he Vaxart Board approved the 2020 Plan on March 24, 2020. To effect it, the stockholders would still have to vote to approve it." *Id.* ¶ 92. The Proxy made clear that stockholders were being asked to vote on an amendment to the 2019 Plan, not a new plan. *See* Proxy at 3 (describing "Proposal No. 3" thus: "To approve an amendment to our 2019 Equity Incentive Plan to increase the number of shares of common stock reserved for issuance thereunder by 6,400,000 shares to 8,000,000 shares.").

stock options covering a total of 2,610,000 shares—including 900,000 shares to Latour—at a per share exercise price of $1.70[101]—the closing price of Vaxart's shares on that day (the "March Awards").[102]  Of the granted stock options, 25% vested on March 24, 2020, and the remaining shares would vest over two years every month thereafter.[103]

On April 13, 2020, the Board approved a grant of stock options covering 54,720 shares to Floroiu upon his joining the Board (the "April Awards").[104] Floroiu's time-based stock options would vest in "three equal annual installments over three years" at a per share exercise price equal to $1.71,[105] the closing price of Vaxart's shares on April 13, 2020.[106]

The March Awards and the April Awards exceeded the number of shares available for issuance from the Plan's 1.6 million Share Reserve.  On April 24, 2020, the Company issued the Proxy for the annual meeting of Vaxart stockholders to be held on June 8, 2020 (the "Annual Meeting").  The Proxy included a proposal to

---

[101] Compl. ¶ 94.

[102] Proxy at 22.

[103] *Id.*

[104] *Id.* at 33.

[105] Compl. ¶ 89.

[106] Proxy at 33.

amend the certificate of incorporation to increase the number of authorizes shares to $150 million.[107] The Proxy also sought stockholder approval of

> an amendment to our 2019 Equity Incentive Plan to increase the number of shares of common stock reserved for issuance thereunder by 6,400,000 shares to 8,000,000 shares.[108]

Noting that the Share Reserve had been depleted to just 110,276 issuable shares,[109] the Proxy warned: "If stockholders do not approve the Plan Amendment, our ability to attract, motivate and retain key employees and directors necessary to compete in our industry could be seriously harmed."[110] The Proxy also stated that:

> In determining the number of additional shares to reserve for issuance under the 2019 Plan, our board of directors considered the number of shares available for future awards, the potential dilution resulting from the proposed increase, equity plan guidelines established by certain proxy advisory firms, and advice provided by the Compensation Committee's compensation consultant.[111]

The Proxy also disclosed the terms of the March Awards of time-based stock options the Board had approved on March 24, 2020, including the specific grants of shares to Latour and two other executives.[112] The Proxy also disclosed the terms of

---

[107] *Id.* at 3.

[108] *Id.*

[109] *Id.* at 19.

[110] *Id.* at 21.

[111] *Id.* at 22.

[112] *Id.* at 32.

the April Awards to Floroiu.[113]  The Proxy revealed that the March Awards and the April Awards would be "exercisable" only if stockholders approved the 2019 Amendment.[114]  The Proxy also described the key features of the 2019 Plan, including that no stock options or stock appreciation rights would be "discounted":

> All stock options and stock appreciation rights granted under the 2019 Plan must have an exercise or strike price equal to or greater than the fair market value of our common stock on the date the stock option or stock appreciation right is granted.[115]

After the Company disseminated the Proxy, but before the Annual Meeting, the Board's Compensation Committee—then consisting of Davis and Maher— recommended annual stock option awards for consideration at a meeting of the Board to be held immediately after the June 8, 2020 Annual Meeting of stockholders.[116]  On May 28, 2020,  the Compensation Committee recommended that Davis, Finney, and Yedid each receive an annual stock option grant covering 65,700 shares that would fully vest one year later on June 8, 2020.[117]  Boyd and Maher were ineligible for stock grants under Armistice policy.[118]  Floroiu was also deemed ineligible for an annual grant of options because he had joined the Board

---

[113] *Id.* at 33.

[114] *Id.* at 22, 32, 33.

[115] *Id.* at 22.

[116] Vaxart Defs.' Ex. 24; Compl. ¶ 149.

[117] Vaxart Defs.' Ex. 24.

[118] *Id.*

within the last six months, and had already been granted options in the April Award.[119] The Committee also approved "[a]ccelerated vesting and [a] two year extension to exercise for [VanLent]" which "is consistent with what was provided other departing directors in the past."[120]

### G. Operation Warp Speed

On May 15, 2020 the White House announced Operation Warp Speed ("OWS")—a "public-private partnership to facilitate the development, manufacturing, and distribution of COVID-19 countermeasures."[121] On June 3, 2020, *Bloomberg* reported that "[t]he White House is working with seven pharmaceutical companies" as part of OWS.[122] "The June 3 *Bloomberg* article revealed the names of five of the seven companies included in OWS. Vaxart was not one of the five identified in the *Bloomberg* article."[123] Plaintiffs allege that, nevertheless, the Board knew by no later than the publication of the *Bloomberg* story that "Vaxart was among the companies chosen to participate in an OWS

---

[119] *Id.*

[120] *Id.*

[121] *Id.* ¶¶ 46 & n.2.

[122] *Id.* ¶ 46.

[123] *Id.* ¶ 50.

25

program."[124]  Vaxart's vaccine, however, was never one of seven vaccine candidates selected to receive federal government funding through OWS.[125]

## H.     The **June 8, 2020 Meetings and Subsequent Events**

Vaxart's Annual Meeting of stockholders was scheduled for Monday, June 8, 2020, which was to be followed by a meeting of the Board.  By Sunday, June 7, Latour had collected all of the written consents of the Board members reflecting their June 5, 2020 approval of the Warrant Amendments. [126]  That day, Latour emailed

---

[124]  *Id.* ¶ 50, 122 (bolding and emphasis omitted).

[125] *See* Simi V. Siddalingaiah*, Congressional Research Service, *Domestic Funding for COVID-19 Vaccines: An Overview* (Mar. 1, 2021), https://crsreports.congress.gov/product/pdf/IN/IN11560/7 ("Vaccine candidates that received federal government support for development include Moderna, Janssen Pharmaceuticals, Sanofi/GSK, and Merck/IAVI . . . whereas the Pfizer/BioNTech, Janssen, and Novavax candidates participated in OWS through federal purchase of doses only."); Kavya Sekar*, Congressional Research Service, *Domestic Funding for COVID-19 Vaccines: An Overview* (Mar. 29, 2021), https://crsreports.congress.gov/product/pdf/IN/IN11556 (noting that "[s]ome vaccine R&D has been supported by NIH, BARDA, and DOD separately from the OWS efforts"). I take judicial notice of these facts because they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *In re Gen. Motors*, 897 A.2d at 169 (citing D.E.R. 201(b)(2)).  Congressional Research Service reports are reliable sources. *Kareem v. Haspel*, 986 F.3d 859, 867 (D.C. Cir. 2021). *See also* "BARDA's Expanding COVID-19 Medical Countermeasure Portfolio," Medical Countermeasures.gov, U.S. Department of Health & Human Services, https://www.medicalcountermeasures.gov/app/barda/coronavirus/COVID19.aspx?filter= vaccine (accessed Nov. 8, 2021) (describing seven vaccine candidates to have received "awards," none of which is Vaxart's). I also take judicial notice of this fact. *See Stewart v. JP Morgan Chase Bank, N.A.*, 2020 WL 444248, at *3 (N.D. Ill. Jan. 28, 2020) (affirmatively noting party's argument that "courts can take judicial notice of official federal websites without converting a motion to dismiss into a motion for summary judgment"); *see accord Stafford v. State*, 2012 WL 691402, at *3 n.2 (Del. Mar. 1, 2012) (taking judicial notice of website for Delaware Criminal Justice Information System).

[126] Compl. ¶ 79.

Charles, the Company's outside counsel, stating that he would "send them to Armistice tomorrow morning, immediately after the board meeting."[127] After counsel responded, Latour agreed to "send them out now" instead.[128] Latour sent Armistice partially executed copies of the Warrant Amendments with the Board signature pages to Armistice that afternoon.[129] Armistice returned "fully signed" copies of the Warrant Amendments at 10:57am on June 8, 2021.[130]

Also on June 7, 2020, the directors received an agenda for the June 8 Board Meeting.[131] The agenda items included updates on "Status Covid program" and "Status COVID funding."[132] Latour, Boyd, Davis, Finney, Floroiu, Maher, and Yedid attended the meeting; Charles served as the meeting secretary.[133] Latour gave the Board a "brief summary of the results" of the immediately preceding 2020 Annual Meeting, noting that "all proposals passed or were approved and adopted by

---

[127] *Id.*

[128] *Id.* The body of counsel's response is redacted from the email.

[129] Compl. 80; Armistice Defs.' Ex. 20. The Complaint draws on the exhibit when it asserts that Latour sent "these Warrant Amendments on a Sunday before the Board meeting." This is a misleading characterization. The exhibit makes clear that what Latour sent was a *partially executed* copy of the Warrant Amendments with the Board signature pages, which Armistice returned the following Monday.

[130] Armistice Defs.' Ex. 20.

[131] Compl. ¶ 141.

[132] Armistice Defs.' Ex. 24.

[133] Vaxart Defs.' Ex. 26.

the stockholders."[134]   Latour then provided an update on Vaxart's COVID-19 vaccine development program, noting that:

> the Company was invited to participate in a non-human primate study organized by Operation Warp Speed and was negotiating the relevant documentation.[135]

The precise date that Vaxart was invited to participate in the study is unclear. Also unclear, and a subject of sharp dispute in this case, is when Latour and the other directors, including the Armistice Directors, became aware of it.  The Plaintiffs insist that "Vaxart's management, the Board, and Armistice knew as of June 3, 2020, and likely on May 28, 2020, that the Company had been chosen as an OWS participant."[136]  Plaintiffs cite no document reflecting such knowledge as of those dates.

Latour's June 8, 2020 discussion also provided a status update on the development and manufacturing of the Company's "oral COVID-19 vaccine candidate."[137]  Turning to the subject of "COVID-19 Funding," Latour "summarized the status of various funding initiatives and potential funding sources, including the

---

[134] *Id.*

[135] *Id.*

[136] Compl. ¶ 66.

[137] *Id.*

March 2020 submission to [REDACTED], the BARDA/NIH funding, [REDACTED], and [REDACTED]."[138]

Representatives of Cantor Fitzgerald then joined the meeting and presented to the Board "potential financing transactions," including "at the market" offerings.[139] The Board next turned to various administrative matters, including a revised insider trading policy, which the Board adopted, effective immediately.[140] The Board received a presentation from the Compensation Committee on "annual director compensation and stock option grants for the directors."[141] The Board agreed to the acceleration of vesting in full of VanLent's shares and to grant 65,700 stock options to Davis, Finney, and Yedid.[142]

The Board Meeting proved to be Latour's last as CEO. On June 13, 2021, the Board (including Latour) executed a written consent deeming it in the best interests of the Company and its stockholders that Latour resign from his position as President and CEO of Vaxart.[143] The written consent also provided that Latour would retain his position on the board. The Board also approved a separation agreement with

---

[138] *Id.*

[139] *Id.*

[140] *Id.*

[141] *Id.*

[142] *Id.*

[143] Compl. ¶ 102; Vaxart Defs.' Ex. 27.

Latour permitting his stock options to "vest for so long as he continues to serve on the Board."[144] The separation agreement also provided for a general release of claims that Latour may have against the Company, its officers, directors, agents, and others.[145]

Latour formally resigned on June 14, 2021, and the Company announced his resignation on June 15, 2021, the day it announced Floroiu as his successor.[146] "No explanation was provided for Latour's resignation."[147]

Upon his appointment as CEO, Floroiu received both time-based and performance-based options. The time-based options gave Floroiu the right to purchase 1,745,280 shares of Vaxart's common stock at a strike price of $2.46 per share, the closing price of Vaxart shares on June 15, 2020.[148] A quarter of the stock option grant would vest on June 15, 2021 with the remaining options vesting in equal monthly installments over the following three-year period, subject to acceleration under certain circumstances.[149] The performance-based options gave Floroiu the right to purchase up to 900,000 shares of Vaxart's common stock at a strike price of

---

[144] Compl. ¶ 102; Vaxart Defs.' Ex. 27.

[145] Vaxart Defs.' Ex. 9 (§§ 2(b), 3, Ex. C).

[146] Compl. ¶ 101; Vaxart, Inc., Current Report (Form 8-K) (June 15, 2021).

[147] Compl. ¶ 105; see Vaxart Defs.' Ex. 27.

[148] Compl. ¶ 104; Vaxart Defs.' Ex. 27.

[149] Compl. ¶ 104; Vaxart Defs.' Ex. 27.

$2.46 per share.[150] One-third of the grant would vest if Vaxart's shares closed at a per share price of $5, $7.50 and $10, respectively, for ten consecutive trading days between June 15 and November 30, 2020.[151]

## I. Further Positive Public Announcements

Just two weeks after the Annual Meeting, Vaxart made three public announcements. On June 24, 2020, the Company announced that it would be included in the Russell 3000.[152] "On this news, Vaxart's stock increased nearly 20%, from a closing price of $2.66 on June 23, 2020 to a closing price of $3.19 on June 24, 2020."[153] "On June 25, 2020, Vaxart announced a manufacturing deal with Attwill Medical Solutions Steriflow, LP for Vaxart's oral COVID-19 vaccine."[154] The Company's stock price closed at $6.26 per share that day, as compared to $2.66 per share on June 23, 2020 and $3.19 per share on June 24, 2020.[155]

---

[150] Compl. ¶ 105; Vaxart Defs.' Ex. 27.

[151] Compl. ¶ 105; Vaxart Defs.' Ex. 27.

[152] Press Release, Vaxart, Inc., Vaxart, Inc. Set to Join Russell 3000® Index (June 24, 2020), https://investors.vaxart.com/news-releases/news-release-details/vaxart-inc-set-join-russell-3000r-index. I take judicial notice of Vaxart's announcement as a "publicly available press release." *In re Duke Energy Corp. Derivative Litig.*, 2016 WL 4543788, at *4 n.34 (Del. Ch. Aug. 31, 2016). Plaintiffs misleadingly assert that, on June 24, 2020, "news emerged that the Company would be included in the Russell 3000"—as if the news came from outside Vaxart. Compl. ¶ 111.

[153] Compl. ¶ 111.

[154] Compl. ¶ 112; Vaxart, Inc., Current Report (Form 8-K) (June 30, 2021) (Ex. 99.1).

[155] "VXRT US Equity: Historical Values," accessed Nov. 8, 2021, Bloomberg Law.

On Friday, June 26, 2020, Vaxart issued a news release titled "COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed."[156] Once the reader got past the headline, she would not learn that Vaxart's vaccine was among the seven vaccine finalists referenced in the June 3, 2020 *Bloomberg* article or the White House announcement of the project. Instead, the body of Vaxart's news release explained that its "oral COVID-19 vaccine has been selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation Warp Speed."[157]

"On this news, Vaxart's stock price jumped to a high of $14.30 and closed at $8.04 on June 26, 2020," reflecting a 128% increase from the prior day's close of $6.26. [158] Thereafter, Vaxart's share price eventually reached a closing price of $16.97 on July 14, 2020.[159] "Since public disclosure of the [OWS Study selection] the stock price has not closed a trading day trading lower than $4.78 per share."[160]

On Friday, June 26, 2020, Armistice exercised the September 2019 Warrant, acquiring 16,666,667 shares of Vaxart at an exercise price of $0.30 per share.[161] It

---

[156] Vaxart, Inc., Current Report (Form 8-K), June 30, 2021 (Ex. 99.2)

[157] *Id.*

[158] Compl. ¶ 35.

[159] "VXRT US Equity: Historical Values," accessed Nov. 8, 2021, Bloomberg Law.

[160] Compl. ¶ 37.

[161] *Id.* ¶ 114.

then immediately sold those shares on the open market that day.[162]    Plaintiffs calculate that Armistice made an immediate profit of "nearly 170 million."[163] Armistice also resumed liquidating its pre-existing position, selling an additional 1,560,000 additional shares that day.[164]

On the next trading day, Monday, June 29, 2020, Armistice exercised the April 2019 Warrant, acquiring 4,090,909 Company shares at an exercise price of $1.10 per share.[165]    And again, it sold those shares on the open market.    Plaintiffs calculate Armistice made a profit of "nearly $30 million" on that trade.[166]    Armistice continued selling off its pre-existing position, selling another 5,294,477 shares it had previously held.[167]    As of June 29, 2020, Armistice owned a stake of 145,523 shares, 0.2% of the Company's outstanding shares.[168]

On August 12, 2020, Latour exercised certain of his stock options to buy 166,667 shares of Vaxart at $0.30 per share.[169]    Vaxart's stock price closed at $9.20 that day, meaning Latour "enjoyed an instant (unrealized) paper profit of over $1.148

---

[162] *Id.*

[163] *Id.* ¶ 11.

[164] *Id.*

[165] Compl. ¶ 12.

[166] *Id.*

[167] *Id.*

[168] Vaxart Inc., Schedule 13D (June 30, 2020).

[169] Vaxart, Inc., Statement of Changes in Beneficial Ownership (Form 4) (Aug. 12, 2020).

million."[170]   In addition, Floroiu's 900,000 performance-based options became fully vested after the Company's stock closed above $10 per share for ten consecutive trading days after July 15, 2020.[171]

### J.    Procedural History

On September 8, 2020, Plaintiff Galjour filed his complaint.  On October 9, 2020, the Vaxart Defendants and the Armistice Defendants both moved to dismiss that complaint in its entirety.[172]  On October 20, 2020, Plaintiffs Jacquith and Paul Bergeron filed their complaint.  The court consolidated the actions on November 12, 2020.[173]  On December 14, 2020, the court entered an order establishing a leadership structure for the Plaintiffs and designated the Jacquith-Bergeron complaint as the operative complaint.[174]  Defendants moved to dismiss the operative complaint.  The court heard argument, taking the matter under submission on August 24, 2021.[175]

On August 4, 2020, plaintiffs not involved in this case initiated separate litigation against Floroiu, Latour, Davis, Finney, Yedid, Boyd, and Maher (the "California Defendants") in the California Superior Court in San Mateo County (the

---

[170] Compl. ¶ 117.

[171] *Id.* ¶108.

[172] Dkt. 18. 19.

[173] Dkt. 53.

[174] Dkt. 72.

[175] Dkt. 121, Dkt. 119.

"California Litigation").[176]  On November 25, 2020, the plaintiffs in the California Litigation filed a Second Amended Complaint.[177]  On December 30, 2020, the California Defendants filed a demurrer.[178]  On March 15, 2021, the California Superior Court granted the demurrer, without prejudice and with leave to replead.[179] On June 17, 2021, the plaintiffs in the California action filed a Third Amended Complaint.[180]  On August 18, 2021, the California Defendants filed a demurrer to the Third Amended Complaint.[181]  Briefing is ongoing.[182]

## II.  ANALYSIS

The Complaint contains five counts.  Count I is a derivative claim alleging the Director Defendants breached their fiduciary duties by approving the Warrant Amendments.  Count II is a derivative unjust enrichment claim alleging the Director Defendants breached their fiduciary duties by issuing spring-loaded options in violation of the 2019 Plan.  Count III is a direct claim alleging Floroiu, Latour, Davis, Finney, Yedid, and VanLent breached their fiduciary duty by failing to disclose Vaxart's selection to participate in the OWS study prior to the stockholder vote on

---

[176] Defs.' Joint Suppl. Br. in Further Supp. of Their Mots. to Dismiss, Ex. 37.

[177] *Id.*

[178] *Id.*

[179] Dkt. 116; *Ennis v. Latour*, 20-civ-03253 (Cal. Super. Ct. Mar. 15, 2021).

[180] *Ennis v. Latour*, 20-civ-03253 (Cal. Super. Ct. Mar. 15, 2021).

[181] *Ennis v. Latour*, 20-civ-03253 (Cal. Super. Ct. June 17, 2021).

[182] *Ennis v. Latour*, 20-civ-03253 (Cal. Super. Ct. Aug. 18, 2021).

the 2019 Amendment. Count IV is a derivative unjust enrichment claim against Armistice. Count V alleges Armistice breached its fiduciary duties as a controlling shareholder or, in the alternative, aided and abetted the Director Defendants' breaches of fiduciary duties.

## A. Standard of Review

### 1. Motion to Dismiss for Failure to State a Claim

On a motion to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6):

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (cleaned up). At the motion to dismiss stage of the litigation, "[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences." *White v. Panic*, 783 A.2d 543, 549 (Del. 2001). "[A] claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law." *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001). The court also need not "accept every strained interpretation of the allegations proposed by the plaintiff." *In re Gen. Motors*

36

*(Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Malpiede*, 780 A.2d at 1083).

### 2.    Motion to Dismiss for Failure to Make a Demand

"Court of Chancery Rule 23.1 and Delaware law require that a stockholder initiating a derivative action plead 'with particularity' either that demand was made on the corporation to initiate suit on its own, or that such demand 'would have been futile.'" *Friedman v. Khosrowshahi*, 2014 WL 3519188, at *9 (Del. Ch. July 16, 2014), *aff'd*, 2015 WL 1001009 (Del. Mar. 6, 2015). Where, as here, the stockholder plaintiffs forgo a demand on the board, they must plead particularized facts creating a reasonable doubt concerning the board's ability to consider the demand. *Patel v. Duncan*, 2021 WL 4482157, at *17 (Del. Ch. Sept. 30, 2021); *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *28 (Del. Ch. Jan. 27, 2021). "The purpose of the demand-futility analysis is to assess whether the board should be deprived of its decision-making authority because there is reason to doubt that the directors would be able to bring their impartial business judgment to bear on a litigation demand." *United Food and Com. Workers Union v. Zuckerberg*, 2021 WL 4344361, at *16 (Del. Sept. 23, 2021) ("*Zuckerberg II*").

In *Zuckerberg II*, the Delaware Supreme Court recently adopted a "refined" demand futility test that blends the analytical elements of *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), and *Rales v. Blasband*, 634 A.2d 927 (Del. 1993). *Zuckerberg*

37

*II*, 2021 WL 4344361, at *16–18. Under this test, when evaluating demand futility, a court must ask three questions on a director-by-director basis:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

*Id.* at *18. "If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile." *Id.* This refined demand utility standard "is consistent with *Aronson*, *Rales*, and their progeny" and the "cases properly applying those holdings remain good law." *Zuckerberg II*, 2021 WL 4344361, at *2.

Demand futility is "conducted on a claim-by-claim basis." *Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, at *4 (Del. Ch. June 26, 2014). To successfully plead demand futility, plaintiffs must therefore focus "upon each particular action, or failure to act, challenged by a plaintiff." *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 983 (Del. Ch. 2007); *accord Khanna v. McMinn*, 2006 WL 1388744, at *14 (Del. Ch. May 9, 2006) ("This analysis is fact-intensive and proceeds director-by-director and transaction-by-transaction.").

38

When the complaints were filed on September 8, 2020 and October 20, 2020, respectively, the Board consisted of Defendants Floroiu, Latour, Boyd, Davis, Finney, Maher, Yedid, and non-defendant Karen J. Wilson—who had joined the Board on August 25, 2020 (such individuals together, the "Demand Board").[183]

### B. Warrant Amendments Claims

Count I alleges a derivative claim that the Director Defendants breached their fiduciary duties by approving the Warrant Amendments.[184] Count I also alleges a derivative claim that the "Armistice Directors breached their fiduciary duties by trading on material, nonpublic information."[185] Count IV alleges that Armistice was unjustly enriched as a result of the Director Defendants approving the Warrant Amendments. Count V alleges Armistice breached its fiduciary duties as a controlling stockholder in obtaining the Warrant Amendments. In the alternative, Plaintiffs allege Armistice aided and abetted the Director Defendants' breaches of their fiduciary duties in approving the Warrant Amendments.

---

[183] Compl. ¶ 129; Galjour Compl. ¶ 69.

[184] Compl. ¶ 168.

[185] *Id.* ¶ 169.

### 1. Armistice Was Not a Controlling Stockholder at the Time of the Transaction.

Plaintiffs allege that Armistice was a controlling stockholder, owing fiduciary duties to Vaxart and its stockholders. The allegations of control permeate the Complaint and underly allegations that the Demand Board is incapable of considering a demand to assert the claims asserted in this action.

Under Delaware law, a controller owing fiduciary duties arises in two circumstances: (1) the alleged controller "owns more than 50% of the voting power of a corporation" or (2) "owns less than 50% of the voting power of the corporation but exercises control over the business affairs of the corporation." *In re GGP, Inc. S'holder Litig.*, 2021 WL 2102326, at *12 (Del. Ch. May 25, 2021).

Plaintiffs do not allege that Armistice owned more than 50% of Vaxart's voting power at the time of any of the challenged transactions. Instead, Plaintiffs cobble together allegations of acts that pre-dated the challenged transactions, either before or during the time that Armistice was selling down its equity position. The question of control is measured at the time of the challenged transaction. *See id.* at *3 (holding that "I cannot reasonably infer from the Complaint that Brookfield was GGP's controlling stockholder at the time of the Transaction"); *see also Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at *9 (Del. Ch. Mar. 26, 2018) (holding that the "Complaint is devoid of any well-pled facts supporting the assertion that there was a controlling stockholder at the time of that transaction").

40

When the assertion of control is not based upon ownership of more than 50% of the voting power of the Company, a plaintiff must plead facts to support a reasonable inference that the alleged controller possessed "(i) control over the corporation's business and affairs in general or (ii) control over the corporation specifically for purposes of the challenged transaction." *Voigt v. Metcalf*, 2020 WL 614999, at *11 (Del. Ch. Feb. 10, 2020). "To plead that the requisite degree of control exists generally, a plaintiff may allege facts supporting a reasonable inference that a defendant or group of defendants exercised sufficient influence that they, as a practical matter, are no differently situated than if they had majority voting control." *Id.* (quoting *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006). "One means of doing so is to plead that the defendant, as a practical matter, possesses a combination of stock voting power and managerial authority that enables him to control the corporation, if he so wishes." *Id.* (quoting *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 553 (Del. Ch. 2003)). "To plead that the requisite degree of control existed for purposes of a particular transaction or decision . . . the plaintiff must plead facts supporting a reasonable inference that the defendant in fact exercised *actual* control" over the board in connection with that transaction." *Id.* at *12. (emphasis added). Because the controller analysis is fact-intensive, the court is unlikely to find control unless plaintiffs can plead a "constellation of facts" supporting control. *Id.* at *22.

41

In support for their position that Armistice was a controller, Plaintiffs point to: (1) the fund's equity position prior to selling off its equity stake in the Company; (2) the Board's appointment of certain directors in October 2019 when Armistice owned more than 50% of the outstanding stock; (3) Armistice's relationships with certain directors and officers; (4) the Warrants; and (5) the Company's March 2020 disclosure that Armistice could exert significant control through its ownership position. These factors are among the relevant considerations of determining control. *See Voigt*, 2020 WL 614999, at *12 (describing and discussing the relevant sources of potential control). Yet the facts alleged in the Complaint, considered collectively, fail to support the inference that Armistice had general or specific control at the time of the challenged transactions.

As a threshold matter, the only transaction in which it is alleged that Armistice received an improper benefit is the Warrant Amendments. There are no allegations that Armistice derived a direct benefit from the March Grants or the April Grants. By March 19, 2020, Armistice no longer owned a majority of the shares of the Company's outstanding stock.[186] By April 9, 2020, Armistice owned 34.5% of the

---

[186] Vaxart Inc., Form 10-K (March 19, 2020) at 43.

shares of the Company's outstanding stock. [187]  Plaintiffs allege that between April 28, 2020 and June 3, 2020, Armistice sold "approximately 18.2 million shares."[188] Thus, by the time the Board approved the Warrant Amendments on June 5, 2020, Armistice's ownership was less than 10% of the Company's outstanding common stock.[189]  As to shares underlying the Amended Warrants, Armistice could not exercise the Warrants if doing so would cause it to own more than 19.99% of common stock in the Company.  Moreover, even if Armistice *could* exercise all 20.8 million shares, it would not own more than 50% of the Company's voting power.[190]

To bridge the gap between Armistice's steadily declining voting power and Plaintiffs' assertion of control, Plaintiffs point to a March 2020 disclosure by Vaxart that, *as of March 2020*, the fund could "exert significant control through this

---

[187] Proxy at 37.

[188] Compl. ¶ 44.

[189] As of April 9, 2020, Armistice owned 25,200,000 out of 72,054,720 shares outstanding. Proxy at 37.  After pausing its sell-off of on June 3, 2020, Armistice owned 7 million shares.  Vaxart, Inc., Statement of Changes in Beneficial Ownership (Form 4) (June 3, 2020) (Armistice Capital, LLC filing).  Assuming the Company did not issue any other shares between April 9 and June 3, 2020, Armistice's stock ownership constituted 9.7% of total outstanding.  In fact, by June 5, 2020, Vaxart's total outstanding stock had increased to 74,184,322 shares. *See* Vaxart, Inc., Schedule 13D (June 9, 2020) (disclosing Vaxart's total beneficial ownership with 19.99% conversion cap on June 5, 2020 to be 16,785,583 shares out of 83,969,905 total outstanding).  With the conversion cap, Vaxart was permitted to purchase only another 9,785,583 shares under the Warrants. Based on these figures, Vaxart's actual ownership on June 5, 2020 was approximately 9.4%.

[190] Full exercise of the Warrants would increase the shares outstanding to approximately 94,941,898, with Armistice owning 27.8 million, or 29% of the outstanding shares.

ownership position."[191]  A company's own disclosures recognizing control may be relevant in the control analysis.  For example, in *Voigt*, the company disclosed in an SEC filing that that a 34.8% stockholder "will have the ability, subject to the fiduciary duties of the individual directors, to control the decisions of the Board." 2020 WL 614999, at *15.  The court concluded that, for pleadings-stage purposes, "the plaintiff is entitled to the benefit of the inference that the disclosure meant what it said by describing [the stockholder] as exercising control at the Board level through the five directors it had appointed, including [two nominally independent directors]." *Id*.

Vaxart's disclosure in its March 2020 Form 10-K is not entitled to the same weight as the disclosure in *Voigt*, even for pleadings-stage purposes.  First, Vaxart's disclosure about control was directly tied to Armistice's March 17, 2020 "ownership position" of more than 35%.  Compl. ¶ 40.  At the time of the Warrant Amendments, however, Armistice did not hold anything close to 35%.  Second, unlike in *Voigt*, Vaxart did not state that Armistice could "control the decisions of the Board."  *Voigt*, 2020 WL 614999, at *15.  Thus, Vaxart's March 2020 disclosure is entitled to little weight in the overall analysis.

---

[191] Pls. Ans. Br. at 49.

The presence of Armistice designees Boyd and Maher on the Board does not establish control. Boyd and Maher constituted two of the eight directors on the Board at the time of the challenged transactions and as of the filing of the operative Complaint. Neither of them is an officer of Vaxart and neither of them is alleged to have taken action to exert control over Vaxart's affairs or any of the challenged transactions.

Plaintiffs then try to stitch together relationships between Armistice, its designees, and other members of the Board to pin control on Armistice. For example, Plaintiffs allege that Yedid and Davis joined the Board in October 2019 at the same time as Boyd and Maher.[192] There are no other allegations suggesting Armistice controlled Davis or that he could not act independently of Armistice. As to Yedid, Plaintiffs add allegations that he had communicated with Latour about the benefit of removing or adjusting the Blockers on the Warrants in the context of Vaxart's gaining a listing on the Russell 2000 or 3000 index.[193] Plaintiffs claim this was "pretextual" because the Company had other alternatives, such as an equity capital raise or stock split.[194] Plaintiffs' second-guessing, and speculation of pretext,

---

[192] Compl. ¶ 4.

[193] *Id.* ¶¶ 67-71.

[194] *Id.* ¶ 70.

absent any well-pleaded allegations of Armistice's control over Yedid, do not support an inference of Armistice as a controller.

Plaintiffs next allege that Floroiu previously worked at Armistice as a Senior Analyst at some unknown time before joining Armistice, and before that, he had previously worked with Boyd at McKinsey.[195]  Well-pleaded allegations of prior relationships and influence over a director may be a factor to support control. *Voigt*, 2020 WL 614999, at *20 ("[a]n obvious source of influence that can lead to an inference of actual control is existence of relationships between the alleged controller and members of a company's board of directors.").  But the allegations of Floroiu's connections to Armistice and Boyd do not support a pleadings-stage inference of a lack of independence, let alone susceptibility to domination.  Plaintiffs offer no allegations of (1) when Floroiu was employed at Armistice; (2) the duration of his employment at Armistice; (3) Floroiu's compensation from Armistice; or (4) any indicia of Floroiu's personal relationships or other evidence of allegiance to Armistice.

Plaintiffs' bare allegations of Floroiu's prior employment at Armistice do not support an inference that Armistice dominated him or that Floroiu would be unable to exercise his fiduciary duties out of fear for retribution.  *See Orman v. Cullman*,

---

[195] *Id.* ¶ 152.

46

794 A.2d 5, 27 (Del. Ch. 2002) ("The naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence."); *accord Friedman*, 2014 WL 3519188, at *11. Nor is there any allegation of the type of long-standing relationship or past conferral of benefits giving rise to "a sense of 'owingness,'" *Orman*, 794 A.2d at 27, that would call into question Floroiu's independence and render him susceptible to a controller's influence. *See In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *17 (Del. Ch. Mar. 28, 2018) (noting that a director is "less likely to offer principled resistance when the matter under consideration will benefit him or a controller to whom he is beholden"); *see also In re Freeport–McMoran Sulphur, Inc. S'holder Litig.*, 2005 WL 1653923, at *12 (Del. Ch. June 30, 2005) (noting the "extensive ties" needed to call into question a director's independence from a controlling entity). The bare allegation that Floroiu worked at McKinsey with Boyd, many years ago—the Complaint lacks any mention of duration—is similarly weak.

Plaintiffs do not even attempt to explain how Floroiu's appointment as Vaxart's CEO bears the imprint of Armistice's influence other than asserting that Floroiu was "Armistice's former senior analyst."[196] For reasons discussed above, this bare assertion fails to sustain an inference of indebtedness, let alone control.

---

[196] Pls.'s Ans. Br. at 50.

That leaves Plaintiffs with the allegation that Armistice was a controller because it obtained a Warrant Amendment on favorable terms. That allegation is inherently circular, but even if that assertion were true, "[m]ore is needed." *GGP, Inc.*, 2021 WL 2102326, at *12. There are no well-pleaded allegations that Armistice had the ability to or exercised control over the Board at the time of, or with respect to, any of the challenged transactions. Accordingly, Plaintiffs have not created a pleadings-stage inference that Armistice owed fiduciary duties to Vaxart as a controller.

### 2. Demand Is Not Excused as to Claims Concerning the Warrant Amendments.

Even if Armistice were a controller, that would not, by itself, excuse demand. *Beam v. Stewart*, 845 A.2d 1040, 1054 (Del. 2004) ("A stockholder's control of a corporation does not excuse presuit demand on the board without particularized allegations of relationships between the directors and the controlling stockholder demonstrating that the directors are beholden to the stockholder."); *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 67 (Del. Ch. 2015) (noting that "neither the presence of a controlling stockholder nor allegations of self-dealing by a controlling stockholder changes the director-based focus of the demand futility inquiry").

Applying *Zuckerberg II*'s refined demand futility test (the "Refined Test") to the facts here, I conclude that Plaintiffs have failed to establish that at least half the

members of the Demand Board was incapable of fairly and impartially considering a litigation demand as to the Warrant Amendments. Plaintiffs concede that Wilson, who joined the Demand Board after the alleged wrongdoing, would be impartial as to any demand with respect to the claims in the Complaint.[197] On the other hand, Defendants concede that Boyd and Maher are not independent and disinterested as to the Warrant Amendments.[198] Plaintiffs must therefore allege particularized facts to support a reason to doubt that two of the remaining five members of the Demand Board are capable of considering a demand.

### a. Were Latour and Floroiu Dependent on the Armistice Directors?

Plaintiffs argue that Latour and Floroiu lacked independence from Boyd and Maher because the Armistice Directors "conferred valuable benefits" upon them, causing them to suffer from excessive "owingness."[199] As to Latour, Plaintiffs argue the Armistice Directors (1) supported his stock option March 2020 stock grant in exchange for Latour's support of the Warrants Amendments and (2) "allowed Latour to remain on the Board" after his resignation as CEO and approved his separation package."[200] As to Floroiu, Plaintiffs allege Floroiu was indebted to the Armistice

---

[197] Pls.' Ans. Br. at 30 n.10.

[198] Vaxart Defs.' Opening Br. at 25.

[199] Pls.' Ans. Br. at 29.

[200] *Id.* at 29–30.

Directors because the Armistice Directors appointed him to his CEO position and approved his "enormously lucrative stock options."[201]

These allegations fail to cast doubt on Latour or Floroiu's independence. Without more, pleading that a board of directors elevated an executive to her current role or approved her compensation is insufficient to establish that the recipient is 'beholden' to any director who approved that decision. *See In re Nine Sys. Corporation S'holders Litig.*, 2014 WL 4383127, at *31 (Del. Ch. Sept. 4, 2014), *aff'd*, 129 A.3d 882 (Del. 2015) ("[T]he Board's appointing Snyder as CEO and electing him as a director, without further evidence, is insufficient to demonstrate that Snyder lacked independence . . . ."); *Aronson*, 473 A.2d at 816 ("It is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director."); *In re INFOUSA*, 953 A.2d at 983 ("Mere recitations of elephantine compensation packages and executive perquisites, however amusingly described, will rarely be enough to excuse a derivative plaintiff from the obligation to make demand upon a defendant board of directors."). Moreover, the written consent executed by the Board contradicts Plaintiffs' assertion that Latour

---

[201] *Id.* at 26.

was "allowed" to stay on the Board.[202] The written consent states that the Board "*requested* that Dr. Latour not tender his resignation."[203]

The Plaintiffs' other allegations against Latour likewise fail to establish their claims. First, the arguments challenging Latour's ability to consider demand are not supported by the allegations of the Complaint. A plaintiff "cannot supplement the complaint through its brief." *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *5 (Del. Ch. May 5, 2010); *see also Orman*, 794 A.2d 5 at 28 n.59 ("Briefs relating to a motion to dismiss are not part of the record and any attempt contained within such documents to plead new facts or expand those contained in the complaint will not be considered."). Second, the *quid pro quo* claim against Latour is conclusory and temporally untethered. The Board awarded Latour the stock options months before Boyd called Latour to propose the Amendments. And when Boyd reached out, Latour immediately turned to outside counsel for advice—undermining Plaintiffs' theory that Latour worked "hand-in-glove" with the Armistice Directors.[204]

As explained above, the Complaint's meager references to Floroiu's employment history do not undermine his presumed independence. The barebones

---

[202] Pls.' Ans. Br. at 29.

[203] Vaxart Defs.' Ex. 27 (emphasis added).

[204] Pls.' Ans. Br. at 29.

allegations that Floroiu once worked at Armistice and with Boyd at McKinsey do not come close to satisfying Plaintiffs' burden of pleading facts that credibly call into question a director's independence. *See, e.g.*, *Baiera*, 119 A.3d at 59–60 (holding that an Orbitz director's sixteen-year employment relationship with Travelport, Orbitiz's controller, was insufficient to call into question his independence from Travelport because three years had lapsed since the employment relationship had ended).

That leaves Plaintiffs with the claim that Floroiu was dependent on the Armistice Directors for his compensation. This, too, is makeweight. Excluding Floroiu, Boyd and Maher were just two of the seven directors on the Board. They lacked "*unilateral* power . . . to decide whether the challenged director continues to receive a benefit." *Orman*, 794 A.2d at 25 n.50 (emphasis added).

### b. Did Floroiu, Latour, Davis, Finney, and Yedid Receive a Material Benefit from the Warrant Amendments?

Plaintiffs argue that Floriu, Latour, Davis, Finney, and Yedid (the "Stock Option Recipients") were interested in the Warrant Amendments because they shared a common goal with the Armistice Directors: to keep the "OWS study secret until after the public stockholders approved the 2020 Plan so that they could grant themselves and, in the case of Latour, keep stock options at an artificially low

exercise price."[205]  Plaintiffs cite to *In re Investors Bancorp, Inc. S'holder Litig.*, 177

A.3d 1208, 1226 (Del. 2017), for the proposition that beneficiaries of two separate

transactions premised on or enabled by the same alleged misconduct have a disabling

interest in the litigation concerning related transactions.  In that case, the Delaware

Supreme Court held that demand was excused with respect to allegations made

against allegedly excessive equity awards, even though each stock option grant was

a different "transaction."  As this court put it in *Calma on Behalf of Citrix Sys., Inc.*

*v. Templeton*, 114 A.3d 563, 576 (Del. Ch. 2015),

> in a derivative challenge to director compensation, there is a reasonable doubt that the directors who received the compensation at issue—regardless of whether that compensation was material to them on a personal level—can be sufficiently disinterested to consider impartially a demand to pursue litigation challenging the amount or form of their own compensation . . .   [T]his conclusion has even more force where, as here, the directors received equity compensation from the corporation because those individuals "have a strong financial incentive to maintain the status quo by not authorizing any corrective action that would devalue their current holdings or cause them to disgorge improperly obtained profits."

114 A.3d at 576 (quoting *Conrad v. Blank*, 940 A.2d 28, 38 (Del. Ch. 2007).

But the court's reasoning in these cases cannot serve to fuse the claims against

the Armistice Directors and the Stock Option Recipients.  Even if one assumes,

*arguendo*, that the stock option awards granted to different recipients over four

months can be treated as a single transaction, the stock option grants and the Warrant

---

[205] *Id.* at 24.

Amendments involved two wholly distinct transactions. The claims challenging these transactions invoke two different legal theories. The claim against the Stock Option Recipients turns on whether the board issued spring-loaded stock options while withholding information from stockholders. The claim against the Defendant Directors for approving the Warrant Amendments turns on whether the Board 'gifted' these amendments for inadequate consideration. Whether the Board sat on inside information which it used to issue spring-loaded options is not pertinent to the Warrant Amendment claims.

Plaintiffs have also failed to plead sufficient "intermediate facts to link the approval of any of these [otherwise unrelated] transactions." *Cal. Pub. Emps.' Ret. Sys. v. Coulter*, 2002 WL 31888343, at *8 (Del. Ch. Dec. 18, 2002). Plaintiffs fail to plead, for example, that the Armistice Directors had the ability to block the stock option awards or cause the stockholders to vote down the 2019 Amendment if the Stock Option Recipients did not approve the Warrant Amendments.[206] The Complaint thus fails to sustain the reasonable inference the Stock Option Recipients received a material benefit from the Warrant Amendments or stood to lose a related material benefit by challenging the decision to approve the Warrant Amendments.

---

[206] Plaintiffs also fail to plead that the stock options were a material benefit to each of the Stock Option Recipients.

### c. The Board Did Not Face a Substantial Risk of Liability.

The Plaintiffs advance two theories that can be construed under *Zuckerberg II* as bids to satisfy the second prong of the Refined Test. Plaintiffs argue, first, that demand is excused because (1) the Warrant Amendments are properly subject to entire fairness review "due to directorial interestedness and nonindependence and the presence of a conflicted, controlling stockholder"[207] and (2) the "Complaint pleads unfair dealing and unfair price for both Warrant Amendments."[208] Plaintiffs also argue that demand is excused because the Board approved the Warrant Amendments in bad faith.

Where, as here, the certificate of incorporation includes an exculpatory provision pursuant to 8 *Del. C.* § 102(b)(7), "a substantial likelihood of liability may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts." *Baiera*, 119 A.3d at 62. That is because the "mere fact that a plaintiff is able to plead facts supporting the application of the entire fairness standard to the transaction, and can thus state a duty of loyalty claim against the interested fiduciaries, does not relieve the plaintiff of the responsibility to plead a non-exculpated claim against each director who moves for dismissal." *In re*

---

[207] Pls.' Ans. Br. at 36.

[208] *Id.* at 39.

55

*Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1180 (Del. 2015). To establish individual liability, Plaintiffs must therefore plead particularized facts that the directors who approved the challenged transaction "harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith." *Id.* at 1179–80. The specter of directorial liability risk only arises, however, if the plaintiff can plead sufficient facts to overcome the business judgement rule or trigger a heightened standard of review. Plaintiffs here have failed to cross that initial pleading threshold.

### i.      Entire Fairness Not Triggered

#### a.      There Was No Controller.

For reasons discussed above, Armistice was not a controlling stockholder at the time the Board approved the Warrant Amendments.

#### b.      There Was No Majority Conflicted Board.

"Delaware decisions have applied the entire fairness framework to compensation arrangements, consulting agreements, services agreements, and similar transactions between a controller or its affiliate and the controlled entity." *In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *15 (Del. Ch. Jan. 25, 2016). To trigger entire fairness review, plaintiffs must plead sufficient facts to support the inference that "the directors making the decision did not

56

comprise a disinterested and independent board majority." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 36 (Del. Ch. 2013). "To determine whether the directors approving the transaction comprised a disinterested and independent board majority, the court conducts a director-by-director analysis." *Id.* at 44–45.

As already discussed above, the Defendants have conceded that the Armistice Directors had a disabling interest in the transaction. But the pleaded facts fail to support the allegation that Latour or Floroiu lacked independence from the Armistice Directors as to the Warrant Amendments. The Complaint also fails to sustain the proposition that Floriu, Latour, Davis, Finney, and Yedid had an interest in the Warrant Amendments by virtue of being granted their stock options.

### c. The Board Did Not Act in Bad Faith.

This court's default standard of review is the business judgement rule—the presumption that the directors "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 183 (Del. Ch. 2014). "Unless one of its elements is rebutted, the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *In re Trados*, 73 A.3d at 43 (quoting *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010)). "Only when a

57

decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty." *Id.*

The business judgement rule may be rebutted by pleading sufficient facts that (1) "the directors making the decision did not comprise a disinterested and independent board majority," *In re Trados*, 73 A.3d 17 at 36; (2) a controlling stockholder stood "on both sides of the deal," *Larkin v. Shah*, 2016 WL 4485447, at *8 (Del. Ch. Aug. 25, 2016), or "receive[d] a benefit not shared with the minority," *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 486 (Del. Ch. 2013); or (3) "the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *Alidina v. Internet.com Corp.*, 2002 WL 31584292, at *4 (Del. Ch. Nov. 6, 2002).

Plaintiffs argue that the Board acted in bad faith by "[g]ifting these amendments" to Armistice so that the latter "could profit from its inside information about Vaxart OWS study selection."[209] Even assuming that the Complaint alleges facts to support a reasonable inference that the Board knew about the OWS Study selection when it approved the Warrant Amendments on June 5, 2020, Plaintiffs fail to explain how the approval of the Warrant Amendments constituted bad faith. Armistice had a pre-existing right to purchase 4,090,909 shares at an exercise price

---

[209] Pls.'s Ans. Br. at 33.

of $1.10 per share under the April 2019 Warrant and 16,666,667 shares at an exercise price of $0.30 per share under the September 2019 Warrants. Removing or adjusting the Blockers did not change that.

Plaintiffs' bad faith claim boils down to the allegation that the Board "gift[ed] the Warrant Amendments without asking for or receiving any consideration."[210] Although they have not labeled it as such, Plaintiffs essentially argue that the Warrant Amendments amounted to corporate waste. To prevail here, Plaintiffs must plead facts supporting the inference that "the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." *White v. Panic*, 783 A.2d 543, 554 n.36 (Del. 2001). First, even if Vaxart received no monetary consideration for the Amendments, the Warrants themselves were hardly a gift; their exercise "increase[d] the Company's cash on hand by $5 million."[211] It would not be unreasonable for the Directors to believe that raising the conversion caps would increase the chances of their exercise, however slightly. Plaintiffs' argument that the Company could raise capital in better ways "involves the sort of second-guessing that the business judgment rule precludes," *In re MFW S'holders Litig.*, 67 A.3d 496, 518 (Del. Ch. 2013), *aff'd*, 88 A.3d 635 (Del. 2014), and does not demonstrate waste.

---

[210] *Id.*

[211] Compl. ¶ 86.

Defendants offer as a separate rationale the fact that Armistice's exercise of the Warrants and subsequent sale of Vaxart shares would make the shares "potentially available for purchase by institutional investors, which could help facilitate Vaxart's inclusion on the Russell 2000 or 3000 index."[212]  Effectively conceding this rationale suffices, Plaintiffs respond that this decision "was a pretext" for the Board's decision to enable Armistice to trade on material, non-public information.  As discussed above, that argument has no legs.[213]  The Complaint shows that the Board did consider the "pro and cons" of the Amendments and apparently determined that the pros outweighed the cons.[214]  Plaintiffs argue that, because no record of the Company's deliberations exist, Plaintiffs are entitled to "an adverse inference of the Board's motivations."[215]  But Plaintiffs are only entitled only to reasonable inferences.  And the Complaint fails to support the reasonable inference that the Board directors were motivated "to enrich" Boyd and Maher.[216]

For these reasons, a majority of the Demand Board did not either receive (i) a material benefit from the Warrant Amendments; (ii) face a substantial risk of personal liability for the claims related to the Warrant Amendments; or (iii) lack

---

[212] Armistice Defs.' Opening Br. at 11.

[213] Pls.' Ans. Br. at 33.

[214] Compl. ¶ 73; Armistice Defs.' Ex. 16.

[215] Pls.' Ans. Br. at 11.

[216] *Id.* at 1.

independence from someone satisfying either (i) or (ii). The claim alleging breach of fiduciary duties for approval of the Warrant Amendments is dismissed because demand is not excused.

### 3. Plaintiffs' Fiduciary Duty Claim for Insider Trading

Plaintiffs next allege that "the Armistice Directors breached their fiduciary duties by trading on material, nonpublic information"—their alleged knowledge of the OWS study selection.[217] To successfully plead that a corporate fiduciary breached his fiduciary duties by engaging in insider trading—a so-called *Brophy* claim[218]—a plaintiff "must show that: 1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 838 (Del. 2011). The doctrine's focus is "preventing unjust enrichment based on the misuse of confidential corporate information." *Id.* at 840.

---

[217] Compl. ¶ 169.

[218] That test is so named after *Brophy v. Cities Service Co.*, 70 A.2d 5 (Del.Ch. 1949). Brophy was "distilled to its essence" in *In re Oracle Corp.*, 867 A.2d 904, 906 (Del. Ch. 2004), *aff'd* 872 A.2d 960 (Del. 2005).

Plaintiffs lodge the *Brophy* claim against two members of the Demand Board—Boyd and Maher.[219] Plaintiffs assert their *Brophy* claim as a derivative claim, alleging that "Vaxart has suffered harm" from Boyd and Maher's profiting "off of material, non-public information."[220] This court treats as derivative *Brophy* claims alleging that a fiduciary possessing material, nonpublic information breached her fiduciary duties by trading on that information. *See In re TrueCar, Inc. S'holder Derivative Litig.*, 2020 WL 5816761, at *7, *26 (Del. Ch. Sept. 30, 2020) (dismissing *Brophy* claim for failure to plead demand futility); *In re GoPro, Inc.*, 2020 WL 2036602, at *9, 11, 15 (Del. Ch. Apr. 28, 2020) (dismissing *Brophy* claim against corporate officers who sold shares while allegedly withholding information from the market that later caused stock price to sink); *see also Diep on behalf of El Pollo Loco Hldgs., Inc. v. Sather*, 2021 WL 3236322, at *24 (Del. Ch. July 30, 2021) (granting special litigation committee's motion to dismiss *Brophy* claim that block trade was improper). That means the Plaintiffs must explain why two other members of the Demand Board would not be able to consider the litigation demand fairly and impartiality. Plaintiffs' theory for why demand is excused under Rule 23.1 seems to be that none of the Director Defendants who approved the Warrant Amendments

---

[219] There is no allegation that either Boyd or Maher personally made any trades involving Vaxart stock while in possession of material non-public information. Because I dismiss this claim for failure to plead demand futility, I need not reach the merits of the claim.

[220] Compl. ¶ 169–70.

would be able to fairly and impartially consider the *Brophy* claims because they were "interested in approving the Warrant Amendments and knowingly facilitated Armistice's insider trading."[221] For the same reasons discussed above, the Complaint fails to plead sufficient facts to support the reasonable inference that any of the other Director Defendants approved the Warrant Amendments to receive a material benefit from Armistice's alleged insider trading; lacked independence from Armistice, Boyd, or Maher; or faced a substantial risk of personal liability from approving the Warrant Amendments. Most pertinent here, the Complaint fails to plead sufficient facts to sustain the inference that the Defendant Directors were motivated to "to enrich" Boyd and Maher in any way and thus invited a substantial risk of liability for conferring a benefit on the Armistice directors out of disloyalty or otherwise in bad faith.[222] The claims against the Armistice Directors are accordingly dismissed because demand was not excused.

### 4.     Unjust Enrichment Claim Against Armistice

Count IV is an unjust enrichment claim against Armistice premised on the breach of fiduciary duty claims against the Board for approving the Warrant Amendments. Plaintiffs allege that "[t]he Warrant Amendments allowed Armistice to realize nearly $267 million in cash proceeds over two trading days" and that

---

[221] Pls.'s Ans. Br at 18.

[222] *Id.* at 1.

"[t]hese benefits were derived from improper means."[223]   As the predicate claim alleging breach of fiduciary duty has been dismissed for failure to make a demand, the claim alleging unjust enrichment must be dismissed as well.  *See Seinfeld v. Slager*, 2012 WL 2501105, at *16 (Del. Ch. Jun. 29, 2012) (dismissing "claims [that] are derivative of the claims that I have already dismissed above"); *Friedman*, 2014 WL 3519188, at *13 (dismissing unjust enrichment claim that was derivative of fiduciary duty claim subject to dismissal for failure to plead demand futility).

### 5. Breach of Fiduciary Duty Claims or, in the alternative, Aiding and Abetting Claims Against Armistice

Count V is a breach of fiduciary duty claim against Armistice.  To state a claim for breach of fiduciary duty, a plaintiff must first allege that the defendant "actually owed a fiduciary duty."  *Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *9 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010).  This claim fails because, as discussed above, Armistice did not owe a fiduciary duty to Vaxart or its stockholders.  *See Ivanhoe P'rs v. Newmont Min. Corp.*, 535 A.2d 1334, 1344 (Del. 1987) ("Under Delaware law a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation.").

---

[223] Compl. ¶ 184.

Plaintiffs argue that, in the alternative, Armistice is liable for aiding and abetting the Director Defendants' breaches of fiduciary duties in approving the Warrant Amendments. To state a claim for aiding and abetting, a plaintiff must allege: "(1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in a breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary." *Gotham P'rs., L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002) (quoting *Fitzgerald v. Cantor*, 1999 WL 182573, at *1 (Del. Ch. Mar. 25, 1999)). "Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach." *Malpiede*, 780 A.2d at 1097. The participation requirement can be satisfied by adequately pleading that the third party "participated in the board's decisions, conspired with [the] board, or otherwise caused the board to make the decisions at issue." *Id.* at 1098. It is a "long-standing rule that arm's-length bargaining is privileged and does not, absent actual collusion and facilitation of fiduciary wrongdoing, constitute aiding and abetting." *Morgan v. Cash*, 2010 WL 2803746, at *8 (Del. Ch. July 16, 2010). Likewise, "conclusory allegations that a third party received 'too good of a deal,' without more, will also be insufficient to state a claim for aiding and abetting the breach of fiduciary duties. *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *24 (Del. Ch. Mar. 31, 2017).

65

A third party can, however, participate in a fiduciary breach by (i) "facilitating or inducing a breach of the duty of care"; (ii) "misleading the fiduciary with false or materially misleading information"; or (iii) "withholding information in a manner that misleads the fiduciary on a material point." *Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.*, 251 A.3d 212, 275 (Del. Ch. 2021).

"Prior decisions of this court have validated the unsurprising proposition that an aiding and abetting claim premised on a derivative cause of action is necessarily derivative itself." *Sheldon v. Pinto Tech. Ventures, L.P.*, 2019 WL 336985, at *13 (Del. Ch. Jan. 25, 2019), *aff'd*, 220 A.3d 245 (Del. 2019) (quoting *Feldman v. Cutaia*, 956 A.2d 644, 662 (Del. Ch. 2007), *aff'd*, 951 A.2d 727 (Del. 2008). *See, e.g.*, *In re First Interstate Bancorp Consol. S'holder Litig.*, 729 A.2d 851, 864 (Del. Ch. 1998) ("If, as [the court has] found to be the case, the claims of primary liability against the defendant directors belong to the corporation and could only be maintained by [the plaintiff] in a derivative capacity, that finding logically applies with equal force to the alleged claims of secondary liability against [an alleged aider and abettor].").

Here, the breach of fiduciary duty claims related to the Director Defendant's approval of the Warrant Amendments were derivative; the aiding and abetting claim is derivative as well. Plaintiffs here have alleged an aiding and abetting claim against Armistice alone. As employees of Armistice, Boyd and Maher have a disabling

66

interest in the outcome of the litigation against their employer. *See, e.g, Silverberg v. Padda*, 2019 WL 4566909, at *8 (Del. Ch. Sept. 19, 2019) (noting that a director "faces the dual fiduciary problem when she approves a stock issuance if he or she is in a fiduciary relationship with the recipient of that stock" and that it was reasonable to infer that a partner and managing director of the recipient entity would not be impartial as to the demand). For reasons already discussed above, Plaintiffs have failed to plead sufficient facts to support their theory that any other members of the Demand Board would be unable to consider a litigation demand against Armistice or the Armistice Directors. Armistice was not a controlling stockholder. Even assuming the fund received a material benefit from the Warrant Amendments, no members of the Board were dependent on Armistice, the Complaint fails to allege particularized facts creating a reasonable doubt as to the capacity of a majority of the Demand Board to impartially consider a demand. Demand is not excused, and the aiding and abetting claim is dismissed.

## III. CONCLUSION

For the foregoing reasons, the motions to dismiss by the Vaxart Defendants and the Armistice Defendants are granted as to Counts I, IV and V. The court requests supplemental briefing and submission of documents cited in the Complaint, which will be detailed in a separate letter to the parties.

**IT IS SO ORDERED.**

67